## IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-CA-00413-COA

**WILLIAM W. WILLIAMS**                                                  **APPELLANT**

**v.**

**URSEL WILLIAMS**                                                          **APPELLEE**

DATE OF JUDGMENT:                12/09/2015
TRIAL JUDGE:                         HON. DEBORAH J. GAMBRELL
COURT FROM WHICH APPEALED:    LAMAR COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:         MICHAEL CLAYTON BAREFIELD
ATTORNEY FOR APPELLEE:          SHAKITA LANETTE TAYLOR
NATURE OF THE CASE:              CIVIL - DOMESTIC RELATIONS
DISPOSITION:                     AFFIRMED - 08/22/2017
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### EN BANC.

### LEE, C.J., FOR THE COURT:

¶1.    In this domestic-relations case, we must determine whether the chancellor properly granted Ursel Williams's request for separate maintenance from her husband, William Williams (Wayne). We must also determine whether the chancellor erred in denying Wayne's request for a divorce from Ursel on the ground of habitual cruel and inhuman treatment. Finding no error, we affirm.

### PROCEDURAL HISTORY

¶2.    Ursel and Wayne married in October 1983. Wayne left the marital home in December 2013, which prompted Ursel to file a complaint in August 2014 for separate maintenance. In December 2014, the Lamar County Chancery Court entered a temporary support order

awarding Ursel separate maintenance. Wayne then filed a counterclaim for divorce alleging habitual cruel and inhuman treatment. After a trial, the chancellor denied Wayne's claim for divorce, and granted separate maintenance to Ursel. Wayne now appeals.

**FACTS**

¶3. Ursel and Wayne married in 1983, later settling in Jones County, Mississippi. Wayne is a disabled veteran. Wayne testified that he has a variety of illnesses and is in poor health. Ursel testified that she also has health issues. According to Ursel, her health renders her unable to work, but she has not been deemed medically disabled and has not actively sought employment in over six years. The parties admittedly have a tumultuous relationship—Wayne described their relationship as "roommates" who argued constantly.

¶4. Wayne testified that in March 2012, September 2012, August 2013, and December 2013, he had heart trouble while at the marital home, and that in each instance, Ursel refused to take him to the hospital. On three of those occasions, Wayne stated that he had to rely on others for transport to receive medical treatment, namely Deloris Williams (no relation) and Michael Murdoch. In December 2013, however, Wayne testified that he had to drive himself on his motorcycle to the hospital in Hattiesburg, Mississippi, from the marital home in Moselle, Mississippi. Instead of returning home following his release from the hospital, Wayne instead moved into Deloris's home. Wayne testified that at one time he had a romantic relationship with Deloris prior to his marriage to Ursel, but his current relationship with Deloris was platonic. Ursel implied that Wayne was having an affair during the marriage.

2

**STANDARD OF REVIEW**

¶5.    It is well settled that appellate courts are bound by a limited standard of review in domestic-relations matters. *Ferguson v. Ferguson*, 639 So. 2d 921, 930 (Miss. 1994). The Mississippi Supreme Court has held that a chancellor's findings of fact "will generally not be overturned by this Court on appeal unless they are manifestly wrong." *Fancher v. Pell*, 831 So. 2d 1137, 1140 (¶15) (Miss. 2002) (citing *Nichols v. Tedder*, 547 So. 2d 766, 781 (Miss. 1989)). The chancellor must have been manifestly wrong or clearly erroneous, or have applied an erroneous legal standard for the findings to be overturned. *Montgomery v. Montgomery*, 759 So. 2d 1238, 1240 (¶5) (Miss. 2000). "For questions of law, our standard of review is de novo." *Shoffner v. Shoffner*, 909 So. 2d 1245, 1249 (¶11) (Miss. Ct. App. 2005).

**DISCUSSION**

**I.    Separate Maintenance**

¶6.    Wayne asserts that the chancellor erred in awarding Ursel separate maintenance. During discovery, Wayne sent requests for admissions to Ursel, who failed to timely answer. As a result, the chancellor deemed the requests admitted. Because the requests were deemed admitted, Wayne argues that Ursel was prevented from proving the essential elements of her separate-maintenance claim. Wayne objected to this issue during trial when Ursel began giving contradictory testimony regarding Wayne's refusal to support her. The chancellor allowed both parties to offer testimony regarding Wayne's financial support.

**A.    Requests for Admissions**

3

¶7.    Rule 36 of the Mississippi Rules of Civil Procedure governs requests for admissions. The rule states, in pertinent part, that a matter will be deemed admitted if the party upon whom the request was served does not timely respond or file an objection addressed to the matter. M.R.C.P. 36(a). A timely response equates to one being made within thirty days. *See id.* Thereafter, the matter is conclusively established unless the court permits the admission's withdrawal or amendment. M.R.C.P. 36(b). "A matter that is deemed admitted does not require further proof." *Locklear v. Sellers*, 126 So. 3d 978, 981 (¶7) (Miss. Ct. App. 2013). Still, while "Rule 36 is to be applied as written, . . . 'it is not intended to be applied in Draconian fashion.'" *In re Dissolution of Marriage of Leverock & Hamby*, 23 So. 3d 424, 432 (¶28) (Miss. 2009) (quoting *DeBlanc v. Stancil*, 814 So. 2d 796, 801-02 (¶26) (Miss. 2002)). Specifically, "[a] certain amount of discretion is vested in the [chancellor] with respect to whether he or she will take matters as admitted." *Earwood v. Reeves*, 798 So. 2d 508, 514 (¶19) (Miss. 2001) (citation omitted).

¶8.    The problem here is that the admissions produced contradictory results. Some of the requests asked Ursel to admit that: the separation was her fault, Wayne did not refuse to support her, and Wayne did not abandon her. However, another request asked Ursel to admit that "there is no significant conduct on [y]our part that negatively impacts the enjoyment of the marriage contract." Ursel obviously admitted to this statement in her untimely response. As such, we fail to see how the matter could be conclusively established as Wayne argues; thus, it was within the chancellor's discretion to rely on the trial testimony to resolve any conflicts. Furthermore, the chancellor recognized that it was within her discretion to review

4

the reason for Ursel's failure to timely answer the requests for admissions. The chancellor found the delay of thirty-three days was not "critical," and we can find no abuse of discretion in this instance. The dissent states that Wayne's requests for admissions were deemed admitted for Ursel's failure to timely reply and that the contradictory admission does not encompass the essential elements of Ursel's separate-maintenance claim. However, the dissent concedes that it is within the chancellor's discretion whether to take matters as admitted. In this instance, we cannot find error by the chancellor.

## B. Amount of Separate Maintenance

¶9. In the alternative, Wayne argues that the chancellor erred in awarding $600 per month in separate maintenance to Ursel and ordering him to pay the mortgage of $365 per month. A chancellor may award separate maintenance when (1) the parties have separated without fault by the wife and (2) the husband has willfully abandoned the wife and refused to support her. *Jackson v. Jackson*, 114 So. 3d 768, 775 (¶17) (Miss. Ct. App. 2013). "[A] wife is not required to be totally blameless to allow an award of separate maintenance, 'but her (mis)conduct must not have materially contributed to the separation.'" *Daigle v. Daigle*, 626 So. 2d 140, 145 (Miss. 1993) (quoting *Lynch v. Lynch*, 616 So. 2d 294, 296 (Miss. 1993)). There are six factors a chancellor should consider in determining the amount of separate maintenance to be awarded: (1) the parties' health; (2) the parties' combined earning capacity; (3) the reasonable needs of the spouse requesting separate maintenance and any children; (4) the necessary living expenses of the payor; (5) the fact that the payee spouse has use of the marital home and furnishings; and (6) any other pertinent facts. *Id.*

¶10. Although the chancellor did not explicitly list each factor, her findings indicate that she did consider them. The chancellor reviewed the parties' financial statuses, including their earning capacity, Wayne's living expenses, and Ursel's financial needs. The chancellor noted that Wayne admitted the following: he willfully abandoned the marital home, Ursel had asked him to return to the marital home, and he adamantly refused to return. The chancellor concluded that Wayne's support of Ursel since the separation had been "haphazard" at best, even after the temporary support order was entered in December 2014. Although admitting that they fought constantly, Ursel testified that she loved Wayne and wanted him to return to the marital home. Ursel further testified that Wayne was not supporting her financially, that he had "changed the bank accounts and left me no money, no nothing, and I couldn't pay the mortgage." Ursel stated she was unable to work and received help with her groceries and gasoline from local charities. Ursel testified as follows:

> I have bad asthma, . . . bad arthritis, . . . and my knee – my meniscus was torn and . . . I [am] supposed to have [a] knee replacement. I can't go nowhere; I can't go to the hospital. I have nobody to take care of me. I have no friends. Nobody. And, you know, when he left me all the time on the weekends alone, I got upset and I moved to my bedroom . . . . I feel safe in the bedroom, I have my TV, my dog, you know. I had nothing else no more. When [Wayne] was home, he sleep[s] until three or four o'clock in the afternoon.

¶11. The chancellor clearly found Ursel's testimony more credible than Wayne's testimony. In this instance, we cannot find the chancellor was manifestly wrong or clearly erroneous in awarding Ursel separate maintenance.

## II. Habitual Cruel and Inhuman Treatment

¶12. Wayne asserts that the chancellor erred in denying his claim for divorce because he

6

proved by a preponderance of the evidence habitual cruel and inhuman treatment by Ursel. This ground for divorce is established by evidence that the conduct of the spouse either:

> (1) endangers life, limb, or health, or creates a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief, or (2) is so unnatural and infamous as to make the marriage revolting to the non-offending spouse and render it impossible for that spouse to discharge the duties of marriage, thus destroying the basis for its continuance.

*Rakestraw v. Rakestraw*, 717 So. 2d 1284, 1287 (¶8) (Miss. Ct. App. 1998) (citation omitted). Here, Wayne was required to prove habitual cruel and inhuman treatment by a preponderance of the evidence. *Shavers v. Shavers*, 982 So. 2d 397, 403 (¶35) (Miss. 2008). Furthermore, "[t]he party alleging cruel and inhuman treatment typically must corroborate the testimony." *Id.*

¶13. The record clearly indicates that the parties did not get along—Wayne described their relationship as "roommates" who argued constantly—but this is not enough to meet the burden required for a divorce based on habitual cruel and inhuman treatment. "Our cases require more than mere unkindness, rudeness, or incompatibility to support the granting of a divorce on the grounds of cruel and inhuman treatment." *Stone v. Stone*, 824 So. 2d 645, 646 (¶4) (Miss. Ct. App. 2002). In any event, the conduct generally "must be routine and continuous." *Lomax v. Lomax*, 172 So. 3d 1258, 1261 (¶6) (Miss. Ct. App. 2015); *see also Burnett v. Burnett*, 271 So. 2d 90, 92 (Miss. 1972) (The "conduct must be habitual, that is, done so often, or continued so long, that its recurrence may be reasonably expected whenever occasion or opportunity presents itself.").

¶14. Wayne's testimony focused on four occasions in the two years prior to the couple's

separation when he alleged Ursel refused to take him to the hospital: in March 2012; September 2012; August 2013; and December 2013.[1] According to Wayne, he suffered from a litany of medical issues, and her refusal to take him to the hospital on these occasions created an apprehension of danger. Wayne said that in December 2013, he asked Ursel for a ride to the hospital and she allegedly told him, "You can sit there and die, you S.O.B." Ursel admittedly refused to take Wayne to the hospital on one occasion, although the testimony is not clear as to when this occurred. She testified that he had been gone all weekend, insinuating that Wayne was with another woman. Ursel stated that she told him to find someone else to drive him, and Wayne did so. On the other three occasions, Ursel testified that Wayne never asked for her help. Ursel stated she was unable to drive him to the hospital in August 2013 due to a broken arm. Wayne also admitted that since 2000, he often had to be taken to the hospital due to his poor health, but that other than the four times previously mentioned, Ursel always drove him to the hospital.

¶15.    "This Court requires corroboration of the offensive conduct complained of by the moving party when seeking a divorce based on the ground of habitual cruel and inhuman treatment, except in unusual cases such as isolation." *Jones v. Jones*, 43 So. 3d 465, 478 (¶30) (Miss. Ct. App. 2009). Additionally, "the corroborating evidence need not be sufficient in itself to establish the ground," but rather "need only provide enough supporting facts for a court to conclude that the plaintiff's testimony is true." Deborah H. Bell, *Bell on Mississippi Family Law* § 4.02[8][d], at 74 (2005). Wayne called two corroborating

_____

[1] Wayne produced two hospital bills as evidence; however, both bills are for hospital services rendered on August 4, 2015—almost two years after Wayne left the marital home.

8

witnesses—Michael and Deloris.

¶16. Michael, Wayne's friend, testified that he took Wayne to the hospital two times in 2012. On one of these occasions, Michael stated that he was at Wayne's house when Wayne complained of chest pain. Michael said Wayne asked for a ride to the hospital. Michael testified that he did not see Ursel at the house either time he drove Wayne to the hospital, so he was unable to corroborate Wayne's testimony.

¶17. Deloris testified that she drove Wayne to the hospital in August 2013. According to Deloris, Wayne told her Ursel would not drive him to the hospital. When Deloris arrived, she said Ursel told Wayne, "I hope you die." Deloris did not hear Ursel refuse to drive Wayne to the hospital. Deloris testified to the couple's contentious relationship, admitting that she had heard both Wayne and Ursel call each other derogatory names. After leaving the marital home, Wayne began renting a room in Deloris's house. Although Wayne and Deloris admittedly had a romantic relationship prior to Wayne's marriage to Ursel, both stated that they were platonic roommates.

¶18. The dissent contends that Wayne met his burden of proof since the testimony of both Ursel and Deloris corroborated his claim. In regard to Ursel, the dissent claims she admitted to refusing to transport Wayne to the hospital in August 2013, thus corroborating Wayne's testimony on that one occasion. However, the testimony was that Ursel could not physically drive him to the hospital due to a broken arm, not that Ursel refused to drive him. Since much of Wayne's testimony was confusing in regard to the material facts, we cannot find the chancellor erred in finding Ursel's testimony more credible in this instance. In regard to

9

Deloris, her testimony only corroborates the parties' contentious relationship. Her testimony regarding the August 2013 trip to the hospital is based upon Wayne's statement that Ursel would not drive him to the hospital—Deloris did not hear Ursel refuse. And much of Deloris's testimony was unclear as to the timing of these incidents.

¶19. Our courts have consistently refused to sanction divorces based on habitual cruel and inhuman treatment where much more serious conduct occurred. *See Stennis v. Stennis*, 464 So. 2d 1161, 1162 (Miss. 1985) (insufficient evidence of habitual cruel and inhuman treatment where a husband slapped his wife, put her in a headlock, and washed her mouth out with soap); *Gwathney v. Gwathney*, 208 So. 3d 1087, 1090 (¶8) (Miss. Ct. App. 2017) (affirmed a chancellor's finding that a wife lacked sufficient corroborating evidence to prove her husband physically abused her); *Reed v. Reed*, 839 So. 2d 565, 571 (¶26) (Miss. Ct. App. 2003) (reversed a chancellor's decision to grant a divorce, notwithstanding physical violence and threats); *Wilbourne v. Wilbourne*, 748 So. 2d 184, 187 (¶5) (Miss. Ct. App. 2000) (affirmed a chancellor's denial of a divorce despite occasional physical violence, finding the evidence insufficient to prove habitual cruel and inhuman treatment).

¶20. The chancellor found Wayne's testimony was not credible, and the testimony of his corroborating witnesses was inconsistent at best. The chancellor believed Wayne's apprehension was due to his poor health and marital strife, not due to Ursel's purported refusal to drive him to the hospital. As previously stated, "mere unkindness, rudeness, or incompatibility" is not enough to support a cruel-and-inhuman-treatment divorce. *Stone*, 824 So. 2d at 646 (¶4). Keeping in mind our limited standard of review, we cannot find the

chancellor's decision to deny Wayne a divorce was manifestly wrong or clearly erroneous.

¶21. **AFFIRMED.**

**IRVING AND GRIFFIS, P.JJ., BARNES, CARLTON, GREENLEE AND WESTBROOKS, JJ., CONCUR. WILSON, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. ISHEE, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED IN PART BY WILSON, J. FAIR, J., NOT PARTICIPATING.**

**ISHEE, J., DISSENTING:**

¶22. The majority would uphold the chancellor's findings as to both Ursel's award of separate maintenance, and the dismissal of Wayne's counterclaim for divorce on the ground of habitual cruel and inhuman treatment. Finding error below, however, I respectfully must dissent.

**I.      Separate Maintenance**

¶23. As the majority acknowledges, Wayne asserts that the chancellor erred in awarding Ursel separate maintenance because the court disregarded requests for admissions that had previously been deemed admitted for failure to timely respond; as a result, he argues the matters were conclusively established, thus preventing Ursel from proving the essential elements of her claim. I agree.

¶24. Regarding separate maintenance, our supreme court has stated:

> [T]he jurisdictional basis of a separate-maintenance decree stems from equitable principles first laid down in Mississippi in *Garland v. Garland*, 50 Miss. 694 (1874). The very power of the court to grant separate maintenance was based upon the following two requirements: *(1) a separation without fault on the part of the wife, and [(2)] the husband's willful abandonment of her with refusal to provide support to her. Rodgers* [*v. Rodgers*], 349 So. 2d [540,] 541 [(1977)]. The *Rodgers* court explained that these two requirements must be satisfied in order for the court to possess the equitable power to order

11

separate maintenance. *Id.*

*Jackson v. Jackson*, 114 So. 3d 768, 775 (¶17) (Miss. Ct. App. 2013) (emphasis added). Our supreme court has also held: "While the law does not require a wife who leaves her husband to be blameless, misconduct on her part which materially contributes to the separation, so that it may be said that the fault of the wife is equal to or greater than that of the husband, . . . is a defense to her suit for separate maintenance." *King v. King*, 246 Miss. 789, 152 So. 2d 889, 891 (1963) (citing *Hilton v. Hilton*, 88 Miss. 529, 41 So. 262 (1906)).

¶25. Following the requests for admissions submitted by Wayne to Ursel, Ursel failed to timely respond and, therefore, the court deemed the requests admitted. Certain requests deemed admitted stated the following:

> **REQUEST NO.1:** Please admit that [y]our course of conduct is a material factor in the separation of the parties at least equal to, if not greater than, that of [y]our husband.
>
> **REQUEST NO.4:** Please admit that separation of the parties was not without fault on [y]our part.
>
> **REQUEST NO.5:** Please admit that [y]our husband did not and has not willfully abandoned [y]ou with refusal to provide support to [y]ou.

¶26. As noted by the majority, Rule 36 of the Mississippi Rules of Civil Procedure governs requests for admissions. Under the rule, a matter will be deemed admitted if the party the request was served upon does not timely respond or file an objection. M.R.C.P. 36(a). A timely response is one made within thirty days. *See id.* The matter is then conclusively established unless the court allows a withdrawal or amendment. M.R.C.P. 36(b). "A matter that is deemed admitted does not require further proof." *Locklear v. Sellers*, 126 So. 3d 978,

981 (¶7) (Miss. Ct. App. 2013). Most important here, however, is the guidance set forth in the advisory committee's note to Rule 36, which reads:

> Rule 36 will be enforced according to its terms; *matters admitted or deemed admitted* upon the responding party's failure to timely respond are conclusively established unless the court, within its discretion, grants a motion to amend or withdraw the admission. *"Any admission that is not amended or withdrawn cannot be rebutted by contrary testimony or ignored by the court even if the party against whom it is directed offers more credible evidence." DeBlanc* [*v. Stancil*, 814 So. 2d 796, 80[1] (Miss. 2002)] (citing 7 James W. Moore, *et al.*, *Moore's Federal Practice* ¶36.03[2], at 36 (3d ed. 2001)).

M.R.C.P. 36 advisory committee's note to 2014 amendment (emphasis added).

¶27. Thus, because Wayne's requests for admissions were deemed admitted by the chancellor, he argues that it was erroneous for the chancellor to ignore those admitted requests, and instead rely upon trial testimony regarding the merits of Ursel's separate-maintenance claim. I agree, as Rule 36 explicitly prohibits such. Wayne objected to this issue during trial when Ursel began giving contradictory testimony regarding Wayne's refusal to support her; yet, the chancellor stated:

> Well, the only problem is the court can allow [the requests] to be confessed, but when I've heard something contrary to the testimony from [Wayne,] namely, I left and said I'm not coming back, then I have to proceed with what I've heard in sworn testimony.

As the advisory-committee note makes clear, however, "[a]ny admission that is not amended or withdrawn cannot be rebutted by contrary testimony or ignored by the court even if the party against whom it is directed offers more credible evidence." *Id.* Therefore, because the record reveals no such motion to amend or withdraw was made by Ursel, the admissions could neither be ignored nor rebutted by testimony at trial. *See id.* Furthermore, the fact that

13

Wayne offered contradictory testimony—namely, that he *did* willfully abandon the marital home (for Ursel's refusal to assist him during medical emergencies)—is of no consequence, as the admissions are only binding upon the party against whom they are offered. *See Shell Oil Co. v. Murrah*, 493 So. 2d 1274, 1277 (Miss. 1986) (holding that the purpose of Rule 36 is to bind the party making the admission, not the party requesting it). Thus, the chancellor's statement, wherein she valued trial testimony over the requests for admissions, was improper, as she did not give the required weight to the respective admissions.

¶28. The majority, however, finds otherwise. Instead, it would affirm the chancellor's disregarding of Rule 36. In doing so, it points to Wayne's third request for admission, which stated: "Please admit that there is no significant conduct on [y]our part that negatively impacts the enjoyment of the marriage contract." Relying on this request alone, the majority argues that the admitted requests produced overall contradictory results—therefore, the matter of Ursel's separate-maintenance claim was *not* conclusively established. As a result then, the majority asserts the chancellor was well within her discretion to rely on trial testimony to resolve any conflicts found within these requests. Citing no authority to support this proposition (and having found none myself), however, I find this argument wholly unpersuasive.

¶29. Put simply, the request from which the majority erects its argument is *not* an essential element of a claim for separate maintenance. *See Jackson*, 114 So. 3d at 775 (¶17). And so, whether contradictory or not, under Rule 36, the requests were *all* admitted. And though "Rule 36 provides a harsh penalty for the failure to comply," requests four and five of those

14

deemed admissions encompassed the *essential elements* of Ursel's claim for separate maintenance—a claim upon which she bore the ultimate burden of proof. *Hawkins v. Hale*, 185 So. 3d 1076, 1078 (¶7) (Miss. Ct. App. 2016).

¶30. Thus, Wayne's requests for admissions were deemed admitted for Ursel's failure to timely reply. The power to deem those requests admitted was well within the chancellor's discretion, which we clearly acknowledge. *See Scoggins v. Baptist Mem'l Hosp.-Desoto*, 967 So. 2d 646, 648 (¶8) (Miss. 2007) (holding *"*[a] certain amount of discretion is vested in the trial judge with respect to whether he or she will take matters as admitted"). To this point, however, the majority apparently mischaracterizes my acknowledgment that a chancellor possesses this discretion and conflates this acknowledgment with my overall conclusion here that the chancellor erred—to be clear, I find no abuse of discretion on the chancellor's part in deeming these requests admitted for failure to timely reply. It appears, however, that the majority blends this discretion "pre-admittance" with that of "post-admittance." Make no mistake, the chancellor here deemed *all* the requests admitted—and that being the case, she could not pick and choose which requests to keep or disregard post-admittance (as the majority seems to assert); only upon a permitted motion to amend or withdraw could those originally admitted requests be overlooked by the court. *See* M.R.C.P. 36(b).

¶31. As such, being conclusively established, and with no motion to amend or withdraw having been made, I find the chancellor committed reversible error—in both her disregarding of the admitted requests for admissions as well as her subsequent awarding of separate maintenance to Ursel. To that end, I would reverse and render as to this issue, and in doing

15

so, urge this Court to recall that a rule not enforced is no rule at all.

## II. Habitual Cruel and Inhuman Treatment

¶32. In *Rakestraw v. Rakestraw*, 717 So. 2d 1284 (Miss. Ct. App. 1998), this Court reiterated the long-held principle that:

> Habitual cruel and inhuman treatment may be established by a showing of conduct that either (1) endangers life, limb, or health, or creates a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief, or (2) is so unnatural and infamous as to make the marriage revolting to the non-offending spouse and render it impossible for that spouse to discharge the duties of marriage, thus destroying the basis for its continuance.

*Rakestraw*, 717 So. 2d at 1287 (¶8) (citing *Daigle v. Daigle*, 626 So. 2d 140, 144 (Miss. 1993)). "[S]uch conduct must be habitual, that is, done so often, or continued so long, that its recurrence may be reasonably expected whenever occasion or opportunity presents itself." *Burnett v. Burnett*, 271 So. 2d 90, 92 (Miss. 1972). "Although the cruel and inhuman treatment usually must be shown to have been 'systematic and continuous,' a single incident may provide grounds for divorce." *Rakestraw*, 717 So. 2d at 1287 (¶8). "While ordinarily one act or an isolated incident will not establish a charge of habitual cruel and inhuman treatment, one incident of personal violence may be of such a violent nature as to endanger the life of the complainant spouse and be of sufficient gravity to establish the charge of habitual cruel and inhuman treatment." *McKee v. Flynt*, 630 So. 2d 44, 48 (Miss. 1993). "[T]he charge 'means something more than unkindness or rudeness or mere incompatibility or want of affection.'" *Rakestraw*, 717 So. 2d at 1287 (¶8) (quoting *Daigle*, 626 So. 2d at 144). Habitual cruel and inhuman treatment must be shown by a preponderance of the

16

evidence. *Shavers v. Shavers*, 982 So. 2d 397, 403 (¶35) (Miss. 2008).

¶33.   "The party alleging cruel and inhuman treatment typically must corroborate the testimony." *Id.*   Nonetheless, "[c]orroborating evidence need not be sufficient in itself to establish habitual cruelty, but rather need only provide enough supporting facts for a court to conclude the plaintiff's testimony is true." *Smith v. Smith*, 90 So. 3d 1259, 1263 (¶12) (Miss. Ct. App. 2011) (citing *Jones v. Jones*, 43 So. 3d 465, 478 (¶30) (Miss. Ct. App. 2009) (quoting Deborah H. Bell, *Bell on Mississippi Family Law* § 4.02[8][d] (2005))).

¶34.   On appeal, Wayne asserts that the chancellor erred in denying his claim for divorce because he proved, by a preponderance of the evidence, with corroborated testimony, that Ursel's conduct endangered his life, limb, and health, thus creating a reasonable apprehension of such danger, and thereby rendering the relationship unsafe for him.  Based upon the evidence presented surrounding Wayne's medical emergencies, I agree.

¶35.   Wayne testified that at four separate times, he experienced medical emergencies while at home, and that Ursel refused to assist him in seeking medical treatment during each instance.  Though Ursel denied refusing to assist Wayne on three of those occasions, she corroborated Wayne's testimony by admitting that she refused to assist Wayne during at least one of those times.  Wayne testified further that on three of those occasions—other than the instance in which Ursel admitted to refusing—he had to rely on Deloris, Murdoch, and himself for transport to receive emergency medical treatment.

¶36.   At trial, Deloris testified that while at the Williamses' home in February 2013, Wayne began experiencing trouble breathing.  When Wayne asked for Ursel's assistance with his

oxygen, Deloris stated that Ursel told Wayne, "I will be glad when you go ahead and die and get it over with." Deloris further testified that later, around August 2013, Wayne called her requesting assistance because Ursel would not help him while he was having severe chest pains. Deloris also said that when she arrived to pick up Wayne, Ursel yelled out at him, "I hope you die," as well as other explicit language. In addition, Deloris testified that, while with Wayne and Ursel following a medical procedure of Wayne's, Ursel asked the doctor, "Why didn't you just let him die?" Lastly, Deloris stated that Ursel threatened Wayne, and told him "the next time he got on his motorcycle, she hoped he had a wreck and die[d]." Murdoch also testified to assisting Wayne at various times for emergency medical needs, but never saw Ursel on those occasions, and thus, did not provide corroborating testimony with respect to her alleged conduct.

¶37.    During the fourth and final occasion, however, Wayne experienced a heart attack. He testified that Ursel told him, "You can sit there and die, you S.O.B." With no available assistance, he was forced to drive himself on his motorcycle from Moselle, Mississippi, to Hattiesburg, Mississippi. Rather than return home following his release from the hospital, Wayne opted to reside at Deloris's home, and has resided there since. Following the conclusion of testimony, the chancellor dismissed Wayne's claim for divorce, and stated:

> Well, you know, let me just tell you both, I know what the burden is for getting a divorce on the grounds of habitual[] cruel[] and inhuman treatment, and it's just not there. Your client has failed to meet any showing with his corroborating witnesses . . . . [Wayne] has testified that . . . since he last worked . . . he has had problems with his heart, problems with his back, problems with C.O.P.D. Those illnesses themselves would have anybody apprehensive of continuing to live. Now his perception of what's going on, it appears that his own testimony and the witnesses showed that every time he

18

thought he was in a crisis, he could call either Mr. Murdoch . . . [or Wayne] has a [motorcycle] that could have been traded for a car where he could take himself, or he had . . . [Deloris] . . . sitting in his house, who on occasion is available. So the Court doesn't see—if there was a brandishment of guns, knives, something of that effect . . . . [T]hey both cuss and fuss and that's it. And I don't see that being habitual. And I don't see that your claim for divorce is meritorious based on what the current law is, and that [m]otion [t]o [d]ismiss is granted. All right, so y'all will stay married to each other.

¶38. I disagree with this ruling by the chancellor. We are reminded that when analyzing a divorce based on habitual cruel and inhuman treatment, "there is a dual focus on the conduct of the offending spouse and the impact of that conduct on the offended spouse." *Smith*, 90 So. 3d at 1263 (¶11). "Evaluating the impact on the offended spouse is a subjective inquiry. The focus is on the effect the conduct has on the particular spouse, not its effect on an ordinary, reasonable person." *Id.* Lastly, "[w]hen there is no violent conduct involved, we review the facts on a case-by-case basis, taking into account the frequency and severity of the conduct, as well as the impact on the plaintiff." *Id.* at (¶13).

¶39. Reviewing the record before this Court, I would submit that Wayne proved, by a preponderance of the evidence and through corroborated testimony, that the effect of Ursel's conduct endangered the life, limb, and health of Wayne. Between the dates of March 2012 and December 2013, Wayne testified to having four medical emergencies—in all four, Ursel did not provide any assistance. Ursel corroborated at least one of these occasions by admitting she refused to assist him during a life-threatening emergency. The fact that Wayne was fortunately able to rely on the kindness of others when in times of need is immaterial. Likewise, whether he could have chosen a more suitable means of transportation than his motorcycle is irrelevant to our analysis. What is more, the chancellor's commentary related

19

to Wayne's illnesses—that such ailments would cause any person to have an apprehension of living—is misguided; the standard is not viewed in the objective, but rather the subjective. *Id.* at (¶11).

¶40. The majority, however, would find the facts of this case do not amount to habitual cruel and inhuman treatment. I respectfully disagree for all the reasons listed herein. In particular, focusing on the frequency and severity of Ursel's conduct with respect to the subjective effect it had on Wayne, I find that Ursel's conduct endangered the life, limb, or health of Wayne, creating a reasonable apprehension of such danger, and thus, rendering the relationship unsafe for him. This is because it was "reasonably expected whenever occasion or opportunity present[ed] itself" that Ursel would not aid Wayne. *See Burnett*, 271 So. 2d at 92. Refusing to assist a spouse during severe, life-threatening medical emergencies is surely of such sufficient gravity to establish a charge of habitual cruel and inhuman treatment. As a result, I would find the chancellor erred in dismissing Wayne's counterclaim for divorce, and therefore, reverse and remand as to this issue.

## CONCLUSION

¶41. Upon careful review of the record, I would find the chancery court committed reversible error in both the granting of Ursel's award of separate maintenance, and the dismissal of Wayne's counterclaim for divorce on the grounds of habitual cruel and inhuman treatment. For these reasons, I would reverse and render the judgment awarding separate maintenance, and reverse and remand the judgment dismissing Wayne counterclaim for divorce.

**WILSON, J., JOINS THIS OPINION IN PART**.